# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

No. 14-70035

United States Court of Appeals
Fifth Circuit

**FILED**

July 17, 2015

Lyle W. Cayce
Clerk

GUSTAVO JULIAN GARCIA

Petitioner – Appellant

v.

WILLIAM STEPHENS, DIRECTOR, TEXAS DEPARTMENT OF CRIMINAL
JUSTICE, CORRECTIONAL INSTITUTIONS DIVISION

Respondent – Appellee

Appeal from the United States District Court
for the Eastern District of Texas

Before HIGGINBOTHAM, JONES, and HIGGINSON, Circuit Judges.

PATRICK E. HIGGINBOTHAM, Circuit Judge:

Gustavo Garcia was convicted of capital murder by a Texas jury and sentenced to death. This is his second federal habeas petition. The district court denied relief on the merits, ordered the case dismissed with prejudice, and did not issue a certificate of appealability (COA). Garcia now requests a COA from this court pursuant to 28 U.S.C. § 2253(c)(1) to appeal the district court's denial of relief. Having carefully reviewed the record, we hold that Garcia failed to exhaust state court remedies with regard to one of the claims he now raises. To the extent Garcia's remaining claims might be barred by AEDPA's procedural strictures we invoke the statutory discretion afforded us to decline to address that possibility and proceed to deny those claims on the

No. 14-70035

merits.[1] We hold that reasonable jurists could not debate the district court's conclusions as to Garcia's remaining claims and accordingly DENY Garcia's request for a COA.

## I. Procedural History

In 1991, a Texas jury found Garcia guilty of capital murder for shooting and killing Craig Turski in the course of committing a robbery at a liquor store where Turski worked.[2] The jury sentenced Garcia to death. On automatic direct appeal, the Texas Court of Criminal Appeals (CCA) initially reversed Garcia's conviction and ordered a new trial, holding that a written confession signed by Garcia violated Texas Code of Criminal Procedure article 38.22 § 2(b), which "requires that no written statement made by the defendant be admitted into evidence unless, on its face, the statement contains a knowing, intelligent, and voluntary waiver of the rights set forth in [section 2(a), which operationalizes a standard *Miranda* warning]."[3] Although Garcia had initialed "G.G." before numbered warnings mirroring the rights listed in section 2(a) and had signed his name adjacent to additional language reinforcing those warnings, the CCA concluded that the written confession did not include "on its face" an express waiver of those rights.[4]

The CCA subsequently granted a motion for rehearing and reversed course, affirming the trial court and holding, "though a close call," that Garcia's individual initialing beside the warnings, taken in context with his signature adjacent to the additional reinforcing language, constituted sufficient evidence

---

[1] *See* 28 U.S.C. § 2254(b)(2) ("An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State.").

[2] Tex. Penal Code Ann. § 19.03(a)(2).

[3] *Garcia v. State*, 919 S.W.2d 370, 383 (Tex. Crim. App. 1996) (reversing and remanding on original submission; affirming on rehearing).

[4] *Id.* at 385.

No. 14-70035

that Garcia "did, on the face of his voluntary statement, knowingly, voluntarily, and intelligently waive his [s]ection 2(a) rights in a manner sufficient to comply with the legislature's intent when it enacted [s]ection 2(b)."[5] Garcia did not file a petition for certiorari with the Supreme Court.

Garcia filed his first application for a writ of habeas corpus in state court in 1997.[6] In 1998, the state habeas court issued findings of fact and conclusions of law, recommending that the application be denied. In February 1999, the CCA adopted the state habeas court's findings and conclusions and denied habeas relief without written order.[7] The state trial court set Garcia's execution date for March 31, 1999. In March 1999, the United States District Court for the Eastern District of Texas, Judge Schell, granted a motion to appoint new counsel and stayed Garcia's execution.

Garcia filed his first federal habeas petition in August 1999, which was supplemented in 2000.[8] In response, the state confessed error as to Garcia's claim that the trial court allowed improper testimony by the state's expert witness during the punishment phase of the trial—so-called *Saldano* error.[9]

---

[5] *Id.* at 387 ("We agree that appellant's statement, while sufficient to comply with Article 38.22, Section 2(b), is by no means a model of clarity on this point. The clearly preferable practice is for a written statement, to meet unambiguously the requirements of Section 2(b), to contain the following language, near or adjacent to the signature of the individual giving the statement: 'I knowingly, voluntarily and intelligently waived the rights described above before and during the making of this statement.'") (citations omitted).

[6] *See Garcia v. Director, TDCJ-CID*, NO. 1:08-cv-720, 2014 WL 5846377, at *1 (E.D. Tex. Nov. 10, 2014) (unpublished).

[7] *Ex parte Garcia,* No. WR–40,214–01 (Tex. Crim. App. Feb. 10, 1999) (unpublished).

[8] *See Garcia v. Director, TDCJ-CID*, NO. 1:08-cv-720, 2014 WL 5846377, at *1 (E.D. Tex. Nov. 10, 2014) (unpublished).

[9] *See Saldano v. Texas*, 530 U.S. 1212 (2000) (mem. op.). The error involved the state's use of a psychologist who testified that one factor predictive of future dangerousness is the defendant's race, and that Garcia's Hispanic ethnicity portended future violence. In *Saldano*, the Supreme Court vacated a death sentence after the Texas attorney general confessed that substantially similar testimony from the same psychologist had been improperly admitted. "Following the Supreme Court's ruling in *Saldano,* four other state inmates, [including Garcia,] each of whom had been sentenced to death as a result of punishment-phase hearings in which [the psychologist] gave substantially similar testimony, petitioned for federal writs

No. 14-70035

On September 6, 2000, the federal district court issued a conditional writ of habeas corpus, requiring the state to conduct a new sentencing hearing.

The state trial court held a second jury trial on sentencing in February and March of 2001, and the jury again sentenced Garcia to death.[10] On automatic direct appeal, the CCA affirmed Garcia's sentence.[11] The CCA denied Garcia's motion for rehearing. Garcia filed a petition for certiorari. The Supreme Court denied certiorari on October 4, 2004, and subsequently denied Garcia's motion for rehearing.[12]

Meanwhile, Garcia filed a second application for a writ of habeas corpus in state court. On February 12, 2008, the state trial court issued findings of fact and conclusions of law recommending that relief be denied.[13] The CCA denied relief in a brief written order on October 15, 2008.[14]

Garcia began the instant proceedings on November 27, 2008 in United States District Court for the Eastern District of Texas; he sought and received appointment of counsel by Judge Heartfield. He filed his second federal habeas petition on October 11, 2009. The district court denied relief in a 163-page opinion on November 10, 2014, dismissing the case and declining to grant a

---

of habeas corpus. The Attorney General confessed error in each case and, in each, the federal court vacated the death sentence and granted a new sentencing hearing." *Saldano v. Roach*, 363 F.3d 545, 549 n.2 (5th Cir. 2004).

[10] 1 RR (2001) at 20-26. Citations to "RR" herein refer to the "Reporter's Records" for Garcia's 1992 and 2001 trials, respectively. Similarly, citations to "CR" refer to "Clerk's Records" for Garcia's 1992 and 2001 trials, respectively.

[11] *Garcia v. State*, No. 71417, 2003 WL 22669744 (Tex. Crim. App. Nov. 12, 2003) (unpublished).

[12] *Garcia v. Texas*, No. 03-10873, 543 U.S. 855 (Oct. 4, 2004).

[13] *See* Appellant's Record Excerpts at Tab 4.

[14] *Ex Parte Garcia*, No. WR-40214-02, 2008 WL 4573962 (Tex. Crim. App. Oct. 15, 2008).

No. 14-70035

certificate of appealability (COA).[15] Garcia now requests a COA from this court

pursuant to 28 U.S.C. § 2253.

## II. Facts of the Offense

We rely on the CCA's factual recitation,[16] which summarized the facts of

the offense as follows:

> The evidence at trial established that on December 9, 1990 [Garcia] and Christopher Vargas entered a liquor store, Beverage Warehouse, in the city of Plano. [Garcia] was armed with a single shot .20 gauge sawed-off shotgun and had additional shells in his possession. [Garcia] ordered the clerk, Craig Turski, to give him the money from the cash register. At the same time, Vargas took beer from the store and put it in their car. A female customer walked in the store, saw [Garcia], and immediately left.
>
> [Garcia] shot Turski at close range in the abdomen. Turski fled outside the store, pursued by [Garcia]. [Garcia] then reloaded the shotgun and shot Turski in the back of the head. The female customer, Donna Delozier Sawtelle, subsequently returned to the store with her husband. Finding the store deserted, they called the police. Turski was found and was transported to the hospital, where he later died from gunshot wounds.
>
> On January 5, 1991 at about 12:30 a.m., Vargas, [Garcia] and [Garcia's] girlfriend (Sheila Phanae Loe) stopped at a Texaco station in Plano. While Loe pumped gas, [Garcia] and Vargas entered the station with the same .20 gauge shotgun used to kill Turski. The clerk, Gregory Martin, was on the phone with his girlfriend. As he saw them enter, he informed her he thought he was about to be robbed and asked her to call the police. Martin was taken into a back room and shot at point blank range in the back of the head. He died at the scene.
>
> [Garcia] claimed Vargas shot Martin. Evidence introduced at trial, however, indicated Vargas was carrying beer to their car

---

[15] *Garcia v. Director, TDCJ-CID*, NO. 1:08-cv-720, 2014 WL 5846377 (E.D. Tex. Nov. 10, 2014) (unpublished).

[16] *See Reed v. Stephens*, 739 F.3d 753, 760-61 (5th Cir. 2014) (relying on CCA's factual recitation).

No. 14-70035

(as he did in the earlier robbery) while [Garcia] shot the clerk. In addition, the shotgun was found near the freezer in close proximity to [Garcia] at the time of his capture. Two firearms experts testified at trial that the shotgun found at the scene of Martin's murder was the same weapon used in Turski's murder.

Alerted by Martin's girlfriend, the police arrived at the scene to find [Garcia], Vargas and Loe still present, Vargas was found, unarmed, standing over Martin's body. He claimed to have just entered the store and found Martin lying there. [Garcia] was found hiding in the freezer area close to where the shotgun was found.

[Garcia] was transported to the Plano Police Department. He was read his "Miranda" warnings repeatedly. He subsequently confessed, both orally and in writing, to the murders of both Turski and Martin. His confessions were videotaped, and a separate written confession was prepared for each offense.

[Garcia's] written statement regarding the killing of Turski in its entirety reads as follows:

> Det. Wilson is writing my statement. Approx. 3–4 weeks from today's date, Chris Vargas & I robbed a liquor store & I killed the clerk. The liquor store was behind a 7–11 store at Plano Pkwy. & Ave. K. I was driving Sheila's Chev. Monza. We waited in the liquor store parking lot until the customers all left. Both Chris & I pulled a 20 ga. sawed-off shotgun on the clerk. I had the clerk give me the money out of the cash register & it was about $500. Chris was grabbing up beer. Chris went outside to pull the car up to the front door. I had the clerk go into a little room next to the cash register & I had him get on his knees. A customer, a white woman walked in the store & saw me & she walked back out. I then panicked and I shot the clerk with the shotgun. The clerk started coming at me & threw a chair at me and then he ran outside. I loaded the shotgun & shot the clerk again outside the store. The clerk had jumped over the fence & was in some grass when I shot him the 2nd time. I then ran to the

No. 14-70035

car & we drove off. I told Sheila my common-law wife
about the robbery after we did it. End—G.G.[17]

The statement was completed at 9:05 a.m. on January 5,
1991. Each page is signed by [Garcia] and two witnesses. The
statement was taken by Det. David Wilson of the Plano Police
Department. . . .

At trial, an acquaintance of [Garcia], Bobby Flores, testified
he was at Vargas' house the night of the Turski murder. Flores
testified that Vargas and [Garcia] left the house and subsequently
returned with beer and a lot of money. Flores asked [Garcia] where
he got the beer and money. [Garcia] in response stated he went
into a store, took the beer and money, shot the clerk and left.[18]

### III. Standard of Review

Pursuant to the Antiterrorism and Effective Death Penalty Act of 1996,
28 U.S.C. §§ 2244, 2253-2266 ("AEDPA"), a prisoner seeking postconviction
habeas relief under 28 U.S.C. § 2254 may appeal a district court's dismissal of
his petition only if he first seeks and obtains a COA from the district court or
the court of appeals.[19] To obtain a COA, the petitioner must make "a
substantial showing of the denial of a constitutional right."[20] "A petitioner
satisfies this standard by demonstrating that jurists of reason could disagree
with the district court's resolution of his constitutional claims or that jurists
could conclude the issues presented are adequate to deserve encouragement to
proceed further."[21]

---

[17] 75 RR (1991) at 111-12 (State's Ex. No. 3). The written statement regarding the
killing of Martin is also contained in the record. 75 RR (1991) at 107-09 (State's Ex. No. 2).

[18] *Garcia*, 919 S.W.2d at 383-85.

[19] 28 U.S.C. § 2253(c)(1)(A).

[20] *Id.* at § 2253(c)(2).

[21] *Miller-El v. Cockrell* ("*Miller-El I*"), 537 U.S. 322, 327 (2003).

No. 14-70035

In considering an application for a COA, we limit our "examination to a threshold inquiry into the underlying merit of [the petitioner's] claims."[22] "This threshold inquiry does not require full consideration of the factual or legal bases adduced in support of the claims. In fact, the statute forbids it."[23] In death penalty cases, "any doubts as to whether a COA should issue must be resolved in [the petitioner's] favor."[24]

Under AEDPA, a district court may not grant habeas relief with respect to any claim that was adjudicated on the merits in state court proceedings, unless the state court's denial of habeas relief:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.[25]

"A state court's decision is 'contrary to' clearly established federal law if 'the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts.'"[26] "A state court's decision involves an 'unreasonable application' of clearly established federal law if 'the state court identifies the correct governing legal principle from [the Supreme Court's] decisions but

---

[22] *Id.* (quoting *Slack v. McDaniel,* 529 U.S. 473, 481 (2000)).

[23] *Id.* at 336.

[24] *Reed v. Stephens*, 739 F.3d 753, 764 (5th Cir. 2014) (alteration in original) (citation omitted).

[25] 28 U.S.C. § 2254(d)

[26] *Hoffman v. Cain*, 752 F.3d 430, 437 (5th Cir. 2014) (alterations in original) (quoting *Williams v. Taylor* 529 U.S. 362, 413 (2000)).

unreasonably applies that principle to the facts of the prisoner's case.'"[27] Finally, we presume correct any factual findings made by the state court unless the petitioner "rebut[s] the presumption of correctness by clear and convincing evidence."[28]

## IV. Discussion

Garcia presents four claims in his COA application: (1) a claim that the admission into evidence at trial of two written confessions violated his rights under *Miranda*; (2) a claim of ineffective assistance of counsel based on a contention that trial counsel unreasonably failed to object at trial to the admission of Garcia's confessions on the basis that he was legally blind and could not read printed *Miranda* warnings or the confessions themselves; and (3)-(4) a pair of *Batson* claims that the state prosecution based its use of peremptory challenges during voir dire on impermissible racial characteristics in violation of the Equal Protection Clause.

### A. *Miranda* and the Written Confessions

Garcia requests a COA for his claim that the admission into evidence of his two written confessions violated the requirements set out by the Supreme Court in *Miranda v. Arizona.*[29] The state trial court found that "[t]here is no evidence that [Garcia] was compelled in any way to give a confession or that his will was overborne by the police officers in any way."[30] We presume the correctness of this finding.[31] Garcia has not offered clear and convincing evidence to rebut it and he thus fails to make a substantial showing that the admission of his confessions violated a constitutional right.

---

[27] *Id.* (alterations in original) (quoting *Williams v. Taylor* 529 U.S. 362, 413 (2000)).
[28] 28 U.S.C. § 2254(e)(1).
[29] 384 U.S. 436 (1966).
[30] 4 CR (1992) at 128.
[31] 28 U.S.C. § 2254(e)(1).

No. 14-70035

### *1. Texas Code of Criminal Procedure Article 38.22*

As an initial matter, Garcia urges that the merits of his *Miranda* claim are fairly debatable by reasonable jurists because the CCA initially overturned his conviction on grounds that one of the written confessions violated a Texas statute that operationalizes *Miranda*.[32] Garcia argues in essence that the CCA's reversal necessarily indicates that jurists *have* disagreed about the merits of his *Miranda* claim. This argument is misplaced, as "federal habeas corpus relief does not lie for errors of state law."[33] The relevant question before this court is not whether reasonable jurists could disagree about whether the written confessions complied with a Texas statute. Rather, we must consider whether reasonable jurists could disagree about whether the admission of the statements violated the Constitution.[34]

### *2. Waiver of* Miranda *Rights*

*Miranda* requires that prior to a custodial interrogation an accused person must be warned: (1) that he has a right to remain silent; (2) that any statement he makes can and will be used as evidence against him in court; (3) that he has a right to consult with counsel prior to questioning; (4) that he has a right to have counsel present during any questioning; and (5) that if he cannot afford an attorney a lawyer will be appointed to represent him.[35] "If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to [invoke any of these rights], the interrogation must cease."[36]

---

[32] *See Garcia v. State*, 919 S.W.2d 370, 383 (Tex. Crim. App. 1996) (reversing and remanding on original submission; affirming on rehearing); *see supra* Part I.

[33] *Swarthout v. Cooke*, 562 U.S. 216, 219 (2011) (quoting *Estelle v. McGuire*, 502 U.S. 62, 67 (1991)).

[34] *See Miller-El I*, 537 at 328 (requiring "a substantial showing of the denial of a constitutional right"); *Lowery v. Collins*, 988 F.2d 1364, 1367 (5th Cir. 1993) ("To obtain review of a state court judgment under [section] 2254, a [petitioner] must assert a violation of a federal constitutional right.").

[35] *Id.* at 468-74.

[36] *Id.* at 473-74.

No. 14-70035

Although an accused "may waive effectuation of the rights conveyed in [these] warnings,"[37] the Supreme Court has held that statements made "during a custodial interrogation [are] inadmissible at trial unless the prosecution can establish that the accused 'in fact knowingly and voluntarily waived *Miranda* rights' when making the statement."[38] This is a two-part inquiry, considered under the "totality of the circumstances surrounding the interrogation."[39] First, the waiver must have been "the product of free and deliberate choice rather than intimidation, coercion, or deception."[40] Second, "the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it."[41]

The trial court found that Garcia "was twice read his *Miranda* warnings" orally and "did not invoke his right to remain silent or his right to counsel," nor did he "indicate in any manner that he desired to do so."[42] This in addition to the fact that Garcia placed his initials beside language tracking *Miranda* on the face of each written confession.[43] Garcia does not dispute that he received a proper *Miranda* warning before offering his confessions and that he did not invoke any *Miranda* right. He contends only that a reasonable jurist could conclude that Garcia did not voluntarily waive his *Miranda* rights under the totality of the circumstances. In support, Garcia cites the following factual circumstances: "Garcia was only four months past his 18th birthday, with moderate education, interrogated by experienced police[,] exhausted,

---

[37] *Moran v. Burbine*, 475 U.S. 412, 421 (1986).
[38] *Berghuis v. Thompkins*, 560 U.S. 370, 382 (2010) (alterations omitted) (quoting *North Carolina v. Butler*, 441 U.S. 369, 373 (1979)).
[39] *Burbine*, 475 U.S. at 421.
[40] *Id.*
[41] *Id.*
[42] 4 CR (1992) at 128.
[43] 75 RR (1991) at 111-12 (State's Ex. No. 3); 75 RR (1991) at 107-09 (State's Ex. No. 2).

hungover, lacking his glasses, and unable to read adequately the statements written for him."[44]

Garcia also cites two cases: *Mincey v. Arizona*[45] and *United States v. Murphy*.[46] The factual circumstances of these cases are easily distinguished from the circumstances surrounding Garcia's confessions. In *Mincey*, the Supreme Court held that a confession was involuntary where the accused: "had been seriously wounded just a few hours" before confessing; was in "unbearable" pain; was "in the intensive care unit . . . lying on his back on a hospital bed, encumbered by tubes, needles, and [a] breathing apparatus;" was "confused and unable to think clearly about either the events . . . or the circumstances of his interrogation;" gave incoherent answers; and even "[in] his debilitated and helpless condition . . . *clearly expressed his wish not to be interrogated.*"[47] In *Murphy*, the Second Circuit held that a waiver was not knowing where the interrogating officer had given an "incomprehensible instruction" that "strongly suggest[ed] that the [accused] *should* talk if they wished to exercise their rights—or, put another way, that they would waive their rights if they remained silent."[48] The factual circumstances to which Garcia points fall short of the egregious conditions present in *Mincey* and *Murphy*. By contrast to these cases, Garcia was given multiple correct *Miranda* warnings before confessing. Even assuming that Garcia was young, exhausted, and without his glasses, Garcia cannot show that he failed to understand the warnings or that he attempted to invoke his rights in any way.

Garcia's *Miranda* claim is without merit. "[A] suspect who has received and understood the *Miranda* warnings, and has not invoked his *Miranda*

---

[44] Application for COA at 18.

[45] 437 U.S. 385 (1978).

[46] 703 F.3d 182 (2d Cir. 2012).

[47] 437 U.S. at 398-401 (emphasis added).

[48] 703 F.3d at 193.

rights, waives the right to remain silent by making an uncoerced statement to the police."[49] Moreover, "waivers may be direct or, in some instances, they may 'be clearly inferred from the actions and words of the person interrogated.'"[50] "Once it is determined that a suspect's decision not to rely on his rights was uncoerced, that he at all times knew he could stand mute and request a lawyer, and that he was aware of the State's intention to use his statements to secure a conviction, the analysis is complete and the waiver is valid as a matter of law."[51] No reasonable jurist could conclude that the evidence Garcia offers clearly and convincingly rebuts the state habeas court's finding that Garcia received, understood, and voluntarily waived his *Miranda* rights.

### B. Ineffective Assistance of Counsel

Garcia requests a COA for his claim that trial counsel unreasonably failed to challenge the voluntariness of Garcia's confessions on the basis that Garcia is "legally blind" and without his glasses could not read the printed *Miranda* warnings or the written statements.[52] In light of the record and our controlling precedents, no reasonable jurist could conclude that Garcia's counsel rendered constitutionally deficient performance.

As an initial matter, Garcia argues that "no reasonable jurist could agree with the [district court's] legal conclusion that factually established blindness fails to go to the heart of whether one signed a knowing waiver of rights."[53] This argument misconstrues both the district court's holding and the relevant ineffective assistance of counsel framework. The district court held that Garcia had not met his burden under section 2254(d) because "the trial court

---

[49] *Berghuis*, 560 U.S. at 388-89.

[50] *United States v. Collins*, 40 F.3d 95, 99 (5th Cir. 1994) (quoting *Butler*, 441 U.S. at 373).

[51] *Burbine*, 475 U.S. at 422-23.

[52] Application for COA at 21-23.

[53] *Id.* at 23.

No. 14-70035

reasonably found that Garcia had not shown that his trial attorneys were ineffective on this issue."[54] We construe Garcia's application for COA as regarding the district court's ineffective assistance of counsel holding generally.

1.

For ineffective assistance of counsel (IAC) claims, "the clearly established federal law against which we measure the state court's denial of relief is the standard set forth in *Strickland v. Washington*, 466 U.S. 668 (1984)."[55] "The metric is now rote."[56] To succeed on this claim, Garcia must show: (1) that counsel's performance was deficient and (2) that the deficient performance prejudiced the defense.[57] A petitioner must make both showings; otherwise "it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable."[58]

"To satisfy the deficient performance prong, 'the defendant must show that counsel's representation fell below an objective standard of reasonableness.'"[59] This is a "highly deferential" inquiry, attended by "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance."[60] "To satisfy the prejudice prong, the defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been

---

[54] *Garcia v. Director, TDCJ-CID*, 2014 WL 5846377, at *67 (Nov. 10, 2014).

[55] *Ward v. Stephens*, 777 F.3d 250, 263 (5th Cir. 2015) (internal quotation marks and citation omitted).

[56] *Hoffman v. Cain*, 752 F.3d 430, 439 (5th Cir. 2014).

[57] *Strickland*, 466 U.S. at 687.

[58] *Id.* at 688.

[59] *Hoffman*, 752 F.3d at 440 (quoting *Strickland*, 466 U.S. at 688) (internal quotation marks omitted).

[60] *Id.* (quoting *Strickland*, 466 U.S. at 689) (internal quotation marks omitted).

different."[61] Finally, while "[s]urmounting *Strickland*'s high bar is never an easy task,"[62] "[t]he standards created by *Strickland* and [section] 2254(d) are both 'highly deferential,' and when the two apply in tandem, review is 'doubly' so."[63] To the extent Garcia's claim arrives as a challenge to the state court's application of *Strickland* under section 2254(d)(1), as opposed to a challenge under section 2254(d)(2) to its determination of the facts, Garcia's burden "is all the more difficult."[64]

2.

We are persuaded that no reasonable jurist could conclude that Garcia has made a substantial showing of constitutionally ineffective assistance under *Strickland*. Trial counsel *did* move to suppress the written confessions on the basis of voluntariness generally,[65] and during the suppression hearings counsel *did* explore a line of inquiry related to Garcia's ability to see and read (excerpt below). These circumstances alone arguably place counsel's conduct within "the wide range of reasonable professional assistance,"[66] relevant to *Strickland*'s first prong. That counsel did not specifically object on the basis of Garcia's alleged blindness therefore cannot support the issuance of a COA on Garcia's IAC claim.

In addition, the issue of Garcia's ability to read the written statements was fully developed before the trial court and the record overwhelmingly belies Garcia's assertion that he could not have read and understood the written

---

[61] *Id.* (quoting *Strickland*, 466 U.S. at 694) (internal quotation marks and alternations omitted).

[62] *Padilla v. Kentucky,* 559 U.S. 356, 371 (2010).

[63] *Harrington v. Richter,* 562 U.S. 86, 105 (2011) (citing *Strickland,* 466 U.S. at 689, *Lindh v. Murphy,* 521 U.S. 320, 333 n.7 (1997), *Knowles v. Mirzayance,* 556 U.S. 111, 123 (2009)).

[64] *Id.*

[65] 4 CR (1992) at 709.

[66] *Hoffman,* 752 F.3d at 440.

statements without his glasses. On cross-examination of the officer who obtained Garcia's confession, defense counsel elicited testimony regarding whether Garcia had his glasses when he confessed and whether the officer knew that Garcia might need them to read the written statements:

[*After playing a video recording of the interview.*]

[Defense Counsel]: [Garcia] is not wearing his glasses in that interview, is he?

[Detective Wilson]: I don't see him wearing any glasses.

[Defense Counsel]: Did you know he needs glasses?

[Detective Wilson]: If he needs them?

[Defense Counsel]: Did you know?

[Detective Wilson]: You know, I'd have to go through the whole tape to listen to what he says to know that because I have not reviewed the tape . . .

[Defense Counsel]: I'm asking you now. Did you know that he needed glasses at the time?

[Detective Wilson]: If he did, I don't remember is all I can answer—

[Defense Counsel]: Okay.

[Detective Wilson]: Is all—the only way I can answer that question.[67]

Subsequently, the following exchange took place during the prosecution's redirect examination of the same officer:

[Prosecution]: Did you hand that statement back to him and tell

---

[67] 9 RR (1991) at 492-93.

No. 14-70035

> him to check it to make sure [you] haven't switched things up on [him] or altered it in some way?

[Detective Wilson]: Yes, sir.

[Prosecution]: Did he appear to do that?

[Detective Wilson]: Yes.

[Prosecution]: Did he appear to be satisfied that it was the same statement?

[Detective Wilson]: Yes.

[Prosecution]: Had you altered it or modified it or changed it in any way?

[Detective Wilson]: No, sir.

[Prosecution]: You recall those questions about how close he had to get to the paper in order to read the warnings?

[Detective Wilson]: Yes, sir.

[Prosecution]: Those warnings are printed in rather small type, aren't they?

[Detective Wilson]: Yes, sir.

[Prosecution]: Did he tell you whether or not he thought he could read them?

[Detective Wilson]: He told me he could read them.

[Prosecution]: All right. Did he appear to read them?

[Detective Wilson]: Yes, sir.

[Prosecution]: All right. Did he read the statement after you had written it?

17

No. 14-70035

[Detective Wilson]: Yes.

[Prosecution]: Did you watch him read it?

[Detective Wilson]: Yes, sir.

[Prosecution]: Did he appear to you to understand it?

[Detective Wilson]: Yes.

[Prosecution]: Did you notice at any time while you were talking to him whether he made any nodding motions with his head as he was reading which would indicate to most observers that he did understand what he was reading and probably approved of it?

[Detective Wilson]: Yes, I did.[68]

Based on the record, the trial court concluded that Garcia "read his written statements before signing them" and that "[t]here is no evidence that [Garcia] was unable to read the English language or to read or understand [the *Miranda* warnings] or written statements."[69] These conclusions are entitled to a presumption of correctness.[70] Although Garcia claims without citation that he is "legally blind," he offers no evidence—much less clear and convincing evidence—to rebut the trial court's findings and conclusions. As this court has interpreted *Strickland*, "counsel is not required to make futile motions or objections."[71] Garcia cannot meet even the first of *Strickland*'s two prongs.

---

[68] 12 RR (1991) at 1036-38; *see also* 62 RR (1991) at 62 (Consistent testimony by Detective Wilson), 69 RR (1991) at 748 (same).

[69] 4 CR (1992) at 712. Moreover, when this issue was revisited during the first state habeas proceedings, the trial court found that Garcia "could, and did, read the warnings and his statement of confession without his glasses" and that Garcia's "counsel did raise the issue of [Garcia's] ability to read without his glasses during the motion to suppress." R.889 (citing SHCR-01 at 96).

[70] 28 U.S.C. § 2254(e)(1).

[71] *Koch v. Puckett*, 907 F.2d 524, 527 (5th Cir. 1990) (citation omitted).

No. 14-70035

## C. *Batson* Claims

Garcia requests a COA for a pair of claims that the state prosecution based its use of peremptory challenges on impermissible racial characteristics in violation of equal protection as articulated in *Batson v. Kentucky*.[72] Specifically, these claims relate to peremptory challenges used by the state during voir dire at the 1991 trial to strike from the venire potential jurors Hazel Holmes, an African American, and Albert Diaz, a Hispanic American. Viewing the voir dire process "in hindsight," Holmes and Diaz were "the only two qualified racial minority members of the entire venire panel that came on individual voir dire."[73] Garcia urges, as he must, that reasonable jurists could disagree with the district court's conclusion that his *Batson* claims fall short under AEDPA's deferential standard.[74]

A *Batson* claim involves three steps. First, the defendant must make a *prima facie* showing to the trial court that the prosecutor has exercised a peremptory strike at the defendant's trial on the basis of race.[75] Second, if a requisite showing is made, the burden shifts to the prosecutor to produce a race-neutral explanation for striking the venireperson at issue and thus rebut the defendant's *prima facie* case.[76] "At this [second] step of the inquiry, the issue is the facial validity of the prosecutor's explanation. Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral."[77] Third, if the prosecution tenders a race-

---

[72] 476 U.S. 79, 95-98 (1986).

[73] 61 RR (1991) at 32-34

[74] *Miller-El I*, 537 U.S. 322, 327 (2003). For the district court's reasoning and conclusion on these claims, see *Garcia v. Director, TDCJ-CID*, 2014 WL 5846377, at *9-*12 (Nov. 10, 2014).

[75] *Batson*, 476 U.S. at 93-94, 96-97.

[76] *Id.* at 94, 97-98.

[77] *Hernandez v. New York*, 500 U.S. 352, 360 (1991) (plurality op.).

19

No. 14-70035

neutral explanation, "the trial court must determine whether the defendant has carried his ultimate burden of proving purposeful discrimination."[78]

To be clear, Garcia does not argue that the state trial court unreasonably applied *Batson*.[79] Nor could he, as the trial court employed the proper steps in evaluating Garcia's claims.[80] Rather, he claims that in light of the evidence presented the trial court unreasonably determined that the prosecutor offered legitimate and racially neutral reasons for striking Holmes and Diaz.[81]

Garcia lodged objections to both of the state's peremptory challenges before the trial court on grounds that the strikes were racially motivated.[82] In both cases, the trial court asked the prosecutor to state his reasons for the challenge.[83] Where a trial court has called on the prosecutor to provide race-neutral justifications for the use of its peremptory strikes, we assume for purposes of review on appeal that the defendant made the requisite *prima facie* showing under *Batson* step one.[84] We therefore consider: (1) whether the prosecution articulated race-neutral explanations for the exercise of its challenges and (2) whether the defendant demonstrated that those justifications were pre-textual and that the prosecutor engaged in purposeful discrimination.

---

[78] *Id.* (citing *Batson*, 476 U.S. at 94 & n.18, 98).

[79] *See* 28 U.S.C. § 2254(d)(1).

[80] 36 RR (1991) at 3760 (Holmes), 39 RR (1991) at 4358-66 (Diaz); *see Garcia*, 919 S.W.2d at 394-95.

[81] *See* 28 U.S.C. § 2254(d)(2).

[82] 36 RR (1991) at 3759-60, 3765-67 (Holmes); 39 RR (1991) at 4366 (Diaz). Garcia unsuccessfully raised both claims on direct appeal to the CCA. *Garcia v. State*, 919 S.W.2d 370, 394-95 (Tex. Crim. App. 1994) (decision on rehearing).

[83] *Id.*

[84] *United States v. Webster*, 162 F.3d 308, 349 (5th Cir. 1998); *see Hernandez v. New York*, 500 U.S. 352, 359 (1991) (plurality op.) ("Once a prosecutor has offered a race-neutral explanation for the peremptory challenges and the trial court has ruled on the ultimate question of intentional discrimination, the preliminary issue of whether the defendant had made a prima facie showing becomes moot.").

No. 14-70035

The state trial court ultimately found that the prosecution offered legitimate and racially neutral reasons for striking Holmes and Diaz, and that the challenges lacked a discriminatory intent.[85] Garcia faces a high hurdle under section 2254(d)(2), as we accord "great deference" to a trial court's findings in these circumstances.[86] Were we to grant a COA and proceed to the merits, our role would be "to 'determine whether the trial court's determination of the prosecutor's neutrality with respect to race was objectively unreasonable and has been rebutted by clear and convincing evidence to the contrary.'"[87]

### 1. Hazel Holmes

We address first Garcia's *Batson* claim with regard to prospective juror Hazel Holmes. The prosecution offered the following race-neutral explanations for striking Holmes: (1) her "unequivocal opposition to the death penalty" as stated in her initial juror questionnaire; (2) "that [she] had . . . a son who [had] been subjected . . . to multiple prosecutions[,] some of which occurred in [the instant county];" (3) that she "expressed at least once that she [felt] that her son was not fairly treated either by police officers or the criminal justice system;" and (4) that she vacillated in response to questioning[88] about whether she could ever answer "no" to the special mitigation question.[89] The prosecution noted further "that we requested that this juror be stricken for cause" and directed the court to its "prior reasons."[90]

---

[85] 36 RR (1991) at 3763-65 (Holmes); 39 RR (1991) at 4365 (Diaz).

[86] *Hoffman v. Cain*, 752 F.3d 430, 448-49 (5th Cir. 2014).

[87] *Id.* (quoting *Murphy v. Dretke*, 416 F.3d 427, 432 (5th Cir. 2005)).

[88] Although the prosecution referred to "special issue number two" in offering this explanation, 36 RR (1991) at 3764, it is clear from the record that he was referencing his colloquy with Holmes regarding special issue number three, the mitigation question. 36 RR (1991) at 3754-55.

[89] *Id.* at 3763-64.

[90] *Id.* at 3763.

No. 14-70035

The record amply supports each of the prosecution's proffered explanations.[91] The trial court expressly found "that [these reasons were] legitimate and racially neutral"[92]—a finding to which this court must accord "great deference."[93] Moreover, during voir dire the prosecution attempted three times to strike Holmes for cause.[94] The trial court noted that, although it denied each for-cause challenge, the decision was "a close call."[95]

Garcia now claims that the prosecution singled out Holmes on the basis of her race and purposefully used a threatening Holocaust analogy to describe the role of a juror in handing down a death sentence—an analogy not used in questioning any other veniremember—to elicit responses unfavorable to the state's position. The prosecution did in fact use a graphic Holocaust analogy in questioning Holmes.[96] And the Supreme Court has recognized that in some cases the disparate use of a "so-called graphic script, describing the method of execution in rhetorical and clinical detail . . . to prompt some expression of hesitation to consider the death penalty," can constitute clear and convincing evidence that a prosecution's proffered justifications are pretextual.[97]

---

[91] *See id.* at 3676-77 (unequivocal opposition to death penalty in questionnaire and testimony); *id.* at 3689 (Q: "Could you [answer questions that result in death sentence]?" A: "That's a hard one to answer."); *id.* at 3689-90 (indicating she would answer in such a way as to "make sure that the defendant received a life sentence and make sure that he is not executed"); *id.* at 3716 ("I do not believe in the death penalty."); *id.* at 3734 ("I don't feel like I can [answer the mitigation question 'no']."); *id.* at 3748 (son's prosecution); *id.* at 3750-51 (unfairly treated; prosecuted in Collin County); *id.* 3754-55 (final vacillating answer); 61 RR (1991) at 35 (testimony regarding questionnaire).

[92] 36 RR (1991) at 3765.

[93] *Hoffman v. Cain*, 752 F.3d 430, 448-49 (5th Cir. 2014).

[94] 36 RR (1991) at 3710; *id.* at 3745; *id.* at 3759.

[95] *Id.* at 3765; *see id.* at 3759 ("[E]ven though [Holmes] has expressed continued opposition to the death penalty and although she has vacillated back and forth, depending on who was asking her the questions, I deny the State's motion for challenge, because she essentially has answered, albeit reluctantly, that she could follow her oath and what she understands to be the law.").

[96] *See id.* at 3683-86.

[97] *Miller-El v. Dretke ("Miller-El II")*, 545 U.S. 231, 255-60, 66 (2005).

No. 14-70035

Nevertheless, Garcia did not raise this claim in his second state habeas petition.[98] We hold therefore that Garcia failed to exhaust state court remedies with regard to this claim and it is consequently procedurally barred under AEDPA.[99]

### 2. Albert Diaz

The prosecution offered several race-neutral explanations for striking Diaz: (1) Diaz "expressed a real concern with . . . participating in a capital murder case with a youthful defendant;"[100] (2) Diaz was hesitant about imposing the death penalty in a random 7-Eleven robbery situation;[101] (3) Diaz indicated—both "verbally" and by his "demeanor"—that he would impose an increased burden of proof at the punishment phase relative to the guilt-innocence phase;[102] (4) Diaz's standard of "beyond a reasonable doubt" was extremely high;[103] and (5) the defense "really like[d]" Diaz.[104] We address each proffered justification in turn.

### a. *Diaz expressed concern about sentencing a youthful defendant to death.*

The prosecution's first proffered justification was that Diaz "expressed a real concern with youth and participating in a capital murder case with a youthful defendant. For the record, our defendant is eighteen or nineteen. I don't remember if he's had a birthday since he's been incarcerated, but we're dealing with a youthful defendant. That concerns me."[105] This justification

---

[98] *See* 1 WR (40,214) at 297-306.

[99] 28 U.S.C. § 2254(b)(1)(A) ("An application for a writ of habeas corpus . . . shall not be granted unless it appears that . . . the applicant has exhausted the remedies available in the courts of the State . . . .").

[100] 39 RR (1991) at 4359.

[101] *Id.* at 4360.

[102] *Id.*

[103] *Id.* at 4361.

[104] *Id.* at 4362.

[105] *Id.* at 4359.

23

finds support in the voir dire transcript. When asked whether he might find it difficult to sentence a youthful defendant to death, Diaz expressed hesitation:

> I'd be strongly opposed to giving someone the death penalty and more prone to giving them life if that's the law rendered under the facts, but I also have to say that I'm not one that feels much sympathy for hardship of upbringing or environment. I'm sensitive to it . . . *Somebody very youthful, I would have a real hard time sentencing him to death,* but if that person was so dangerous and the crime was such that it was so terrible, I would not have a problem doing it."[106]

Later, however, Diaz indicated that he would be able to do so, "[i]f necessary" to uphold the law:

> [Prosecutor]: So then you don't have a bias or prejudice against a law that allows a youthful defendant to be executed?
>
> [Diaz]:    No. I do not.
>
> [Prosecutor]: And you can see yourself honestly and realistically participating in a process that would lead to the execution of a youthful defendant?
>
> [Diaz]:    If necessary.[107]

Garcia asserts that because Diaz ultimately indicated that he would be able to participate in a capital murder trial involving a youthful defendant, the prosecution's explanation is based on an "untrue" characterization of the record.[108] We disagree. We have upheld peremptory strikes as race-neutral on the basis of a prospective juror's hesitation, even where the juror ultimately

---

[106] *Id.* at 4290 (emphasis added).
[107] *Id.* at 4291.
[108] Application for COA at 45.

indicated he could vote to impose death.[109] It is not fairly debatable that Diaz's earlier statement—"Somebody very youthful, I would have a real hard time sentencing him to death"—posed a legitimate reason for the prosecution's strike, even taking into account his ultimate affirmative answer.

### b. *Diaz was hesitant about imposing the death penalty in a random 7-Eleven robbery situation.*

The prosecution's second proffered justification was that "[w]hile he stated that the death penalty for a random killing would be fine, he also state[d] a real concern about [the] death penalty in a 7-Eleven holdup. We are dealing essentially with . . . a beer and wine store, convenience store situation, very similar situation. That concerns me."[110] Again, this justification finds support in the voir dire transcript. Diaz stated he "would be less inclined to sentence someone to death unless [that person] was really in [his] opinion a person who [he] felt was of extreme danger [judging] from the [person's] acts," but that it would "[j]ust depend[ ] on the facts."

Garcia asserts that the prosecution's second justification is also "untrue," but he offers no relevant evidence in support; he cites to an unrelated portion of the voir dire transcript dealing with the prosecutor's discussion of mitigating circumstances.[111] Garcia cannot meet his burden. Reasonable jurists could not disagree as to whether Garcia has provided clear and convincing evidence to show that the trial court's ruling was objectively unreasonable because Garcia has offered no relevant evidence whatsoever.

### c. *Diaz indicated he would apply an increased burden of proof in the punishment phase relative to the guilt-innocence phase.*

---

[109] *See Hoffman*, 752 F.3d at 449 (upholding peremptory strikes as race-neutral where potential juror initially hesitated before giving a "very weak 'I think I could'" when asked if he could consider a death penalty).

[110] 39 RR (1991) at 4360.

[111] *See* Application for COA at 45 (quoting 39 RR (1991) at 4334).

No. 14-70035

The prosecution's third proffered justification was that Diaz verbally and by his demeanor indicated that he would apply an increased burden of proof in the punishment phase relative to the guilt-innocence phase; Diaz indicated that his definition of "beyond a reasonable doubt" was "a very extreme standard. I don't know if any prosecutor could meet it[,] especially at the punishment phase of a trial."[112] Again, this justification finds support in the voir dire transcript. The prosecutor engaged in an extended back-and-forth discussion with Diaz regarding Diaz's conception of the prosecution's burden of proof.[113] First, as to the guilt-innocence phase, Diaz stated that he "would not feel like it has to be proved perfect certainty[,] . . . [b]ut if it was of extreme certainty. . . . I would be very much inclined to feel very certain the facts that somebody was guilty."[114] Subsequently, as to the punishment phase:

[Prosecutor]: [B]ut when we get into the punishment phase . . . my question to you is are you one of those people in the punishment phase of a capital murder case. *Does my burden of proof go up?*

[Diaz]:        *Absolutely.*

[Prosecutor]: Okay. I want to make sure we're communicating.

[Diaz]:        I would -- I would feel that it would be of much more importance for me to have a strong feeling about each one of those questions *so I would have to say that it is of a higher degree of concern to me that I feel very strongly about each one of those three questions being beyond a reasonable doubt.*

[Prosecutor]: Okay. Again I'm not sure if we're miscommunicating or not so I want to press you a little bit. Are you telling me that . . . I would have to convince you with

---

[112] 39 RR (1991) at 4360-61.
[113] *See id.* at 4308-17.
[114] *Id.* at 4309.

No. 14-70035

> one hundred percent certainty in the punishment phase . . . that the answer should be yes before you would be willing to return a yes verdict on this?

[Diaz]:     Not with a hundred percent certainty. No sir.

[Prosecutor]: All right. Will you recognize my burden of proof in [the guilt and punishment phases is] . . . [t]he same legal standard?

[Diaz]:     Yeah. *I realize that beyond a reasonable doubt is in my mind just as important at every phase but emotionally I would probably feel -- not probably. I would feel a lot more inclined to say that my degree of beyond a reasonable doubt would increase.*[115]

Although Diaz ultimately indicated that he "would try to maintain the same measurement standard" in both phases,[116] we have upheld as legitimate similar explanations proffered by the prosecution in similar circumstances.[117] Moreover, we also take into consideration the prosecution's additional justifications related to Diaz's "demeanor":

> [H]is initial responses indicated that he would, and from his demeanor, which is not reflected in the record, while I understand that intellectually he will do it, it was apparent that there was that more concern going and that argument going on in his brain. It could be read in his eyes. I was standing five feet away from him when he said it. I certainly—I am convinced that my burden of

---

[115] *Id.* at 4311-14 (emphasis added).

[116] *Id.* at 4314.

[117] *See Jackson v. Dretke*, 181 F. App'x 400, 408 (5th Cir. 2006) ("Even though [the prospective juror] softened his statement that he would require proof of guilt to a certainty, the state was entitled to conclude that he might require it to prove guilt by an elevated standard even if that burden were something less than metaphysical certainty."); *see also White v. Thaler*, 522 F. App'x 226, 229-30 (5th Cir. 2013) (per curiam) (upholding dismissals for cause where prospective jurors indicated that they would "hold the [s]tate to a higher burden of proof with regard to punishment").

proof will increase in the punishment phase of a trial versus a guilt-innocence phase.[118]

In *Wainwright v. Witt*,[119] the Supreme Court observed that "determinations of demeanor and credibility" in the voir dire context "are peculiarly within a trial judge's province."[120] This court later underscored this principle:

> A stranger to the trial reading the bare transcript is left with incomplete sentences and elliptic answers with no reconciling theme. Yet one present at trial may well have had a quite different picture. Inflection of voice and body movements of each cast member, absent from the transcript, are present at trial.[121]

Here, the trial judge, who oversaw and observed the voir dire proceedings, accepted as legitimate the prosecution's explanation that Diaz indicated he would apply a higher standard of proof at the punishment phase[122]—an explanation based in part on the prosecution's assertion that it was supported by Diaz's demeanor. In doing so the trial judge emphasized that he had "listened carefully, particularly carefully . . . to [Diaz's] voir dire."[123] The district court's conclusion is thus bolstered by the language of *Witt* and *Ruiz*, both of which emphasize the trial judge's peculiar ability to discern such things. Garcia offers no rebuttal evidence whatsoever to demonstrate that reasonable jurists could disagree as to whether the district court's conclusion was objectively reasonable.

### d. *Diaz indicated he would require a significant track record of violence.*

---

[118] 39 RR (1991) at 4360.

[119] 469 U.S. 412 (1985).

[120] *Id.* at 428; *see id.* at 428 n.9 ("[T]he manner of the juror while testifying is oftentimes more indicative of the real character of his opinion than his words. That is seen [by the trial court below], but cannot always be spread upon the record.") (quoting *Reynolds v. United States*, 98 U.S. 145, 156-57 (1879)).

[121] *Ruiz v. Quarterman*, 460 F.3d 638, 646 (5th Cir. 2006).

[122] 39 RR (1991) at 4365.

[123] *Id.* at 4364.

The prosecution's fourth proffered justification was that Diaz "expressed a . . . willingness to answer questions that would lead to the death penalty if there was a significant track history of violence. I don't know what he meant by that. I can certainly show some violent acts, but I don't know if it will certainly meet his extreme definition beyond a reasonable doubt."[124] Garcia again asserts that this explanation is "untrue," and that "Diaz said just the opposite . . . ."[125]

This justification finds some support in the voir dire transcript. Diaz indicated that he favored rehabilitation up to a point where "there's enough certainty that there's some type of hope," and that no such hope would exist "if there's such a track record and such a history of tremendous violence and crime in [a] defendant's past."[126] When read in context, however, these statements do not overwhelmingly indicate that Diaz would have required the prosecution to show a significant track record of violence in order to vote for a death sentence:

> [Prosecutor]: Along the line of rehabilitation, how much import-ance do you place on the mindset of the individual to be rehabilitated? Do you think that that plays a role if any in the process and if so how big a role?
>
> [Diaz]: I'd probably weigh that the heaviest that if someone is at a point in their life where they can be rehabilitated and there's enough certainty that there's some type of hope then absolutely *but if there's such a track record and such a history of tremendous violence and crime in their past I'd be a little bit concerned that there's not a lot of hope for rehabilitation at least not that person to be rehabilitated and put back in society.* So I guess what I'm trying to say is that I believe everybody should

---

[124] 39 RR (1991) at 4361.

[125] Application for COA at 45.

[126] 39 RR (1991) at 4293.

> be tried to go through extreme rehabilitation but not everybody should be given the right to come back in society.[127]

But even so, in light of the reasons discussed above and below, which provide strong support for the trial court's ultimate conclusion that the strike was legitimate and race neutral, no reasonable jurist could conclude that the trial court's acceptance of this justification was objectively unreasonable.

### e. *Defense counsel liked Diaz.*

The prosecution's fifth and final proffered justification was that the defense "obviously like[d] [Diaz]. They spent thirty minutes questioning him and did not ask him really any . . . serious questions along the lines to develop anything . . . close to a challenge for cause. The questions that I [had] asked [him would have provided] a viable reason . . . to develop a challenge for cause if [d]efense counsel was so inclined . . . [But they didn't.] . . . [T]hat indicates to me that they really like this guy . . . Anyone that a defense attorney wants that much and feels will be favorable to the defense, I have a serious problem with."[128] Garcia asserts that this "is not a race-neutral reason" because "[i]f the reason the defense liked Diaz was because he shared the same race as Garcia, or could appreciate Garcia's family experiences, then liking the juror is confirmation that race motivated the [prosecution's] strike."[129]

Garcia's argument is without merit and in any event he offers no relevant countervailing evidence. As the prosecutor explained from the stand at the *Batson* hearing, this justification was tied to strategy and tact. The trial judge apparently agreed:

[Prosecutor]:  I don't want anybody that the defense counsel in any

---

[127] *Id.* (emphasis added).

[128] *Id.* at 4361-62.

[129] Application for COA at 45.

No. 14-70035

trial wants that badly. There has to be a reason for it. You have an investigator. I don't know what your investigator is turning up. I assume you had your reasons, but whatever, you know, it may have been a great, you know, feint.

[The Court]:    Faked me out of my shoes.[130]

As discussed above, we accord deference to a trial judge's conclusion, especially when it attends the type of determination peculiarly within his province. Garcia provides no reason to depart from this principle here, much less a clear and convincing one. Reasonable jurists could not disagree.

**f. *Trial Court findings as to* Batson *claim regarding Albert Diaz.***

Having heard the prosecution's proffered justifications, the trial court expressly found that the reasons were racially neutral[131]:

> . . . I have listened carefully, particularly carefully . . . to this voir dire. I believe that there were ample reasons for either side to have exercised a peremptory strike in this particular instance, although he was not challenged for cause and he would otherwise be a qualified juror, but the Court is of the opinion that either side could have legitimately and from a racially neutral standpoint exercised a peremptory strike . . . and so any objections to the State's being able to exercise its peremptory strike are overruled.[132]

Garcia does not purport to offer significant contrary evidence—at most, he musters disagreement with these findings. But "[m]ere disagreement with the state court factual findings is not sufficient to overcome those findings."[133] Reasonable jurists could not disagree, and therefore Garcia is not entitled to a COA on his *Batson* claim regarding Albert Diaz.

---

[130] 61 RR (1991) at 91.
[131] 39 RR (1991) at 4365.
[132] *Id.* at 4363-65.
[133] *Teague v. Scott*, 60 F.3d 1167, 1170 (5th Cir. 1995) (citation omitted).

No. 14-70035

## V.

Garcia's request for a COA is DENIED as to all claims.